NOT DESIGNATED FOR PUBLICATION

No. 119,113

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

JODY L. MOLER,
*Appellee/Cross-appellant*,

and

WILLIAM R. MOLER,
*Appellant*/*Cross-appellee*.


MEMORANDUM OPINION

Appeal from Johnson District Court; CHRISTINA DUNN GYLLENBORG, judge. Opinion filed July 26, 2019. Affirmed in part, reversed in part, and remanded with directions.

*Joseph W. Booth*, of Lenexa, and *Peggy S. Bisping*, of Shawnee, for appellant.

*Gary L. Ayers*, of Foulston Siefkin LLP, of Wichita, and *Anne E. Burke*, of Burke McClasky Stevens, of Overland Park, for appellee.


Before GARDNER, P.J., GREEN and ATCHESON, JJ.


PER CURIAM: This appeal arises from a district court's interpretation and application of supplemental child support and supplemental maintenance provisions in the parties' post-divorce settlement agreement. Both parties have appealed, challenging the supplemental amounts due for 2015.

*Factual and Procedural Background*

William and Jody Moler married in 1990 and had three children, born in 1993, 1998, and 2000. They divorced in 2013. The decree included the parties' Separation and Property Settlement Agreement (Settlement Agreement) and Parenting Plan approved by the court. When the parties divorced, the youngest two of the three children were minors subject to the jurisdiction of the district court. Now, all the children are over 18.

The parties agreed that William would pay Jody $3,560 per month in "base child support." The base child support calculation was made by averaging the extended and nonextended income formulas based on William's salary of $275,000.

In addition to base child support, the parties agreed to a supplemental child support provision:

> "[I]n addition to the Base Child Support described above . . . [Jody] shall receive 10% of the amount, if any, by which the sum of all [William's] earned income (wherein 'earned income' shall be defined as bonus income and cash distributions from stock options/restricted stock options and excluding any income from investments including but not limited to those investments shown on the attached spreadsheet and the actual stock options or restricted stock options [William] may receive) exceeds his current salary ($275,000 per year). The supplemental child support shall be prorated for the last year the support is due (any year a child emancipates)."

The parties challenge the district court's application of this provision and the supplemental maintenance provision on appeal.

Both parties waived their rights to statutory maintenance from the other and agreed to a supplemental maintenance provision. It defined "earned income" identically to the definition of that term in the supplemental child support provision:

"[I]n lieu of any month to month maintenance and in consideration for the division of marital assets, that [Jody] shall receive 20% of the amount, if any, by which the sum of all [William's] earned income (wherein 'earned income' shall be defined as bonus income and cash distributions from stock options/restricted stock options and excluding any income from investments including but not limited to those investments shown on the attached spreadsheet and the actual stock options or restricted stock options [William] may receive) exceeds his current salary ($275,000 per year)."

The primary issues on appeal are whether certain income William received during 2015 is included in the Settlement Agreement's definition of "earned income," and whether the parties could use that definition instead of the Kansas Child Support Guidelines' (Guidelines) definition of income in calculating supplemental child support.

William and Jody agreed to exchange their relevant tax and financial documents each year to facilitate calculation of the amounts due. Unless one party died or Jody remarried or cohabitated with another adult, William would pay supplemental maintenance through 2020. The parties also agreed to his payment of other items, such as insurance costs relating to the children, college costs not covered by the children's college funds, pet care, vehicles for the children, and other expenses. The Settlement Agreement also divided the marital assets and debts. Jody received $2,429,819—about 56% of the marital estate—while William received the remaining $1,839,082.

*Careers and Salaries*

Jody did not work outside the home for the large majority of the marriage. Around the time of the divorce, Jody took a minimum wage job as a paraprofessional in a school. She began teaching second grade full-time in August 2016 with an annual salary of $40,950.

From 2004 to 2012, William worked for Inergy Midstream, LLC, a midstream oil and gas company. In October 2012, William left his position as Chief Operating Officer of Inergy to work at Tallgrass Energy Partners (Tallgrass), a company that "builds critical energy of a structure for the transportation of crude oil and natural gas." William described Tallgrass as starting with "nine guys and the bank." By the time of the parties' divorce, William was Chief Operating Officer, Executive Vice President, and a board member of Tallgrass, which had grown to 650 employees.

In June 2013, 33 days after the court approved the parties' Separation Agreement, William was awarded 50,000 Equity Participation Units (EPUs) in Tallgrass in accordance with the company's long-term incentive plan. The plan defined EPUs as "a phantom (notional) unit granted under the Plan which entitles the Participant to receive, in the discretion of the Committee, a Unit or amount of cash equal to the Fair Market Value of a Unit" which would later be converted to common units of the partnership. The vesting schedule was subject to an "in-service date"—meaning the date that the Pony Express Crude Oil Pipeline was completed and began service. One-third of the EPUs were to vest on the latter of May 13, 2015 or the in-service date, while the other two-thirds were to vest on the latter of May 13, 2017 or the in-service date. Vesting depended on William's continued employment.

William could not choose whether to receive a stock option or an EPU, nor did he participate in any meeting in which the board determined whether he got cash, a stock

4

option, or a unit. But he was part of the discussion when developing the EPUs, and he described the EPU system as something good for both the employees and the company:

> "We wanted it to be more upbeat and supportive of the employees. Everybody in the company got some form of equity participation unit. And we wanted it to be titled something that was indicative of what we wanted them to have, which everybody pulling the rope the same direction, doing the same things for the same good and value, working as a team. So equity participation unit we felt met that standard."

In May 2015, the first third of William's EPU award—16,667 units—vested with a fair market value of $809,350. William received no cash as a result of this portion of the award vesting, but the receipt of the award was a taxable event. The dollar amount was considered "federal taxable wages" according to William's earnings statement, and they were reported under wages and salaries—not investment income or options—on his 2015 tax return. William had 6,239 units withheld to satisfy his tax liability.

William also received a $500,000 discretionary cash bonus in 2015, which he did not dispute was bonus income that Jody had a right to include in calculating supplemental support. His 2015 tax return showed that he received $895,426 of nonpassive income and a cash distribution of $12,292,331 from Tallgrass KC, LLC—a Tallgrass subsidiary company related to the one William worked for.

*Litigation Leading to this Appeal*

In June 2016, Jody and William's middle child turned 18 and William moved to modify both the base child support and the supplemental child support formulas. He asked that the supplemental support, 10% for two children, be prorated for 2016 and 5% thereafter for the remaining minor child, as was consistent with the Separation Agreement. Jody moved to modify child support, alleging that William's income had materially increased since the decree of divorce was filed. William later moved for

5

determination of the amount owed in supplemental support in 2015. The court set the matter for a two-day trial in May 2017.

The parties filed several motions in limine about the anticipated testimony of their expert witnesses. William's expert was Professor Edwin T. Hood, Emeritus Professor of Law at the University of Missouri-Kansas City. Jody's expert was G. Matt Barberich, Jr., CPA. The parties and their experts testified at trial.

*District Court's Memorandum Decision*

The district court found that the supplemental support provisions in the parties' Settlement Agreement were subject to at least two possible interpretations, so they were ambiguous. The court admitted extrinsic evidence to aid in clarifying the intent and purposes of the uncertain language of the contract, but not to vary or nullify its clear provisions.

The district court found that EPUs are a form of equity compensation that does not constitute earned income as defined in the parties' Settlement Agreement, so it excluded EPUs from the supplemental spousal support calculations. It determined that the parties "specifically excluded forms of equity compensation and investment income" when determining the supplemental support calculation. It found Hood, William's expert, to be "far more persuasive and logical" than Barberich, Jody's expert, and adopted Hood's testimony and opinions in its findings.

The court also found supplemental spousal maintenance included William's annual salary, bonuses, and cash distributions from stock options/restricted stock options but excluded William's income from investment and his equity compensation, whether in the form of stock options, restricted stock options, or EPUs. Its decision did not, however, mention which category William's income from Tallgrass KC fit into.

6

Finally, the district court held that the parties' redefinition of income for supplemental child support was unenforceable because their definition of "earned income" differed from the definition of "gross domestic income" in the Guidelines. It found it in the best interests of the children to adopt Jody's methodology of calculating supplemental child support on William's total income, including income from EPUs and Tallgrass KC.

*Postrial Motions*

Jody moved to alter or amend the judgment to clarify that the $895,426 William received from Tallgrass KC should be included when calculating supplemental maintenance. William then moved the court to alter or amend its orders by finding that all income from investments—including taxable passive and nonpassive investment income—should be excluded from supplemental maintenance calculations. He asked that the ruling be altered with specific findings for the amounts he owed for 2015, 2016, and 2017.

The court sustained Jody's Motion to Alter or Amend Judgment and denied in part and sustained in part William's Motion to Alter or Amend. The court found that Jody was entitled to 20% of William's earned income exceeding $275,000 per year, including the income from Tallgrass KC and cash distributions from stock options and restricted stock options but excluding passive income from investments and equity compensation—whether it be in the form of stock options, restricted stock options, or EPUs. The district court therefore adopted Jody's calculations for what is owed for 2015 and 2016 and adopted William's calculations for what is owed for 2017.

Both parties appealed, challenging the amount of supplemental support due for 2015.

7

*Did the District Court Err in Excluding Equity Participation Unit Income When Calculating Supplemental Maintenance?*

We first address Jody's argument that the district court erred in not including the value of William's vested EPUs when determining the amount of supplemental maintenance to which she was entitled.

*Standard of Review*

Whether a written instrument is ambiguous is a question of law subject to de novo review. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013). To the extent ambiguity exists, questions on the parties' intent raise a question of fact subject to an abuse of discretion standard. *Nungesser v. Bryant*, 283 Kan. 550, 566, 153 P.3d 1277 (2007); *George v. Capital South Mtg. Investments, Inc.*, 265 Kan. 431, 444, 961 P.2d 32 (1998).

*Analysis*

Jody argues that the district court erred when it determined that the parties should exclude William's EPU income from the supplemental support calculations. She argues that the phrase "earned income" is unambiguous, and that William's EPU award was bonus income which is included in the definition of "earned income."

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.'" *Stechschulte v. Jennings*, 297 Kan. 2, 15, 298 P.3d 1083 (2013). A court can consider evidence other than the agreement itself only if a contract is ambiguous. *In re Marriage of Johnston*, 54 Kan. App. 2d 516, 526, 402 P.3d 570 (2017), *rev. denied* 307 Kan. 987 (2018). A

contract is ambiguous when there is more than one reasonable interpretation of its language. *In re Estate of McLeish*, 49 Kan. App. 2d 246, 255, 307 P.3d 221 (2013). And a divorce settlement agreement retains its contractual aspects even after it has been incorporated into a divorce decree. *In re Marriage of Hudson*, 39 Kan. App. 2d 417, 426, 182 P.3d 25 (2008).

We find that the Settlement Agreement is subject to different interpretations about what the parties meant to include in and exclude from the definition of "earned income." By creating their own definition of that term, the parties sowed the seeds of confusion. We thus agree with the district court that the Settlement Agreement is ambiguous, so the district court appropriately considered parol evidence to help determine whether EPUs— which are unique to this company—are earned income.

Testimony from the parties and their experts diverged on this issue. Jody's expert, Barberich, testified that the EPUs were included in the definition of "earned income" as bonus income, while William's expert, Hood, testified that the EPUs were excluded from that definition as equity-based compensation similar to restricted stock options. We review challenges to specific factual findings in support of maintenance or child support determinations to ensure that those findings are supported by substantial competent evidence sufficient to support the district court's conclusions of law. See *In re Marriage of Hair*, 40 Kan. App. 2d 475, 486, 193 P.3d 504 (2008) (maintenance); *In re Marriage of Atchison*, 38 Kan. App. 2d 1081, 1085, 176 P.3d 965 (2008) (child support).

Barberich testified that the EPUs are equivalent to a bonus because their vesting is based on William's services for the completion of a particular project by a specific deadline. He described this set up as a pay-for-performance agreement because the compensation in the form of EPUs is distributed only upon the successful completion of the Pony Express Pipeline by May 2018. Upon vesting, the EPU ceases to exist and the recipient has a tradeable share of Tallgrass. No company-imposed restrictions exist on

9

trading an EPU after it vests into a common unit, but given William's position within Tallgrass, he may be subject to certain SEC restrictions in his ability to complete transactions with his vested units.

Barberich testified that the value of the EPU award—$809,349—was included with William's other compensation, including salary and bonus, on his May 2015 pay stub. That amount was also included in William's gross pay on his W-2. William's 2015 tax return did not report the vesting of the EPUs as a return on investment or dividends or interest but reported it under wages and salaries. He considered the award a bonus because it was contingent on work performance and the completion of the Pony Express Pipeline. In his opinion, the fact that the EPUs convert to units (stock) instead of cash, upon vesting, makes no difference. Barberich said that a nonemployee could purchase a unit that would be considered investment income, but because William earned his, it would not be considered income from investments within the meaning of the Settlement Agreement.

Hood disagreed. He noted that the $809,349.52 was labeled as "Long Term Incentive" on William's pay stub, not "bonus" as discretionary cash bonuses were labeled. That dollar value represented the fair market value of the first third of the EPU award vesting, and although it was a taxable event, William received no cash. The receipt of the Long-Term Incentive was a taxable event much the same as receipt of restricted stock would have been.

Hood explained that when a company is a master limited partnership, such as Tallgrass and Inergy, employees do not receive stock—they receive units. William received restricted units from Inergy, much like the type of unit he was awarded at Tallgrass. Hood called these awards a form of equity compensation. He opined that an EPU is equity-based compensation in the same way that restricted stock options are equity-based compensation. The Settlement Agreement excludes stock options and

10

restricted stock options from the definition of "earned income" in the supplemental support calculations. Hood testified that William does not owe supplemental support when he receives the fair market value of an EPU award because it is excluded per the parties' definition in their Settlement Agreement.

As to the testimony about EPUs, the district court made express credibility findings:

> "The Court further finds that Equity Participation Units do not constitute income per the parties' PSA and are not included in the calculation of supplemental spousal support. The Court finds that the analysis, reasoning and opinions of the Respondent's expert Hood to be far more persuasive and logical . . . . The Court further finds that the Respondent's testimony in this regard[] to also be persuasive and adopted by the Court as its findings as well. In adopting the Respondent's expert Hood's opinion, the Court has rejected the Petitioner's expert's opinion finding simply that the Petitioner's expert's conclusions and analysis were not as persuasive to this Court."

"Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). Thus, we credit the district court's finding that Hood's opinion and William's opinion were weightier, more credible, or more persuasive than Barberich's opinion and Jody's opinion as to EPUs. The testimony of Hood and William provides substantial competent evidence supporting the district court's conclusion that William's EPU income was not to be included when calculating supplemental support under the Settlement Agreement.

11

*Did the District Court Err in Awarding Jody a Share of the Tallgrass KC, LLC Distribution?*

We next address William's argument that the district court erred by awarding Jody a share of his $895,426 income from Tallgrass KC.

*Analysis*

In response to Jody's motion to alter or amend, the court found that the income as reported on William's Tallgrass KC, LLC K-1 amounting to $895,426 should be included in the calculation of supplemental spousal support William owes. William argues that this was an error because the Settlement Agreement excluded income from investments, specifically ones from this entity. We agree.

The Settlement Agreement specifically excludes investment income from the supplemental support definition of "earned income," including but not limited to the investments included on the spreadsheet attached to the Settlement Agreement. That spreadsheet listed "Tallgrass" in the amount of "$450,000"—likely a reference to William's initial $450,000 investment in Tallgrass KC. Although William's testimony was equivocal as to whether this entry on the spreadsheet was to Tallgrass KC, the record supports a reasonable inference that it does so. It is thus expressly excluded from the definition of "earned income" in the supplemental agreements.

But an alternative explanation supports that same conclusion—both experts testified that the Tallgrass KC income was "earned income" as defined by the parties in the Settlement Agreement. Barberich testified on direct examination that the $895,426 distribution from Tallgrass KC was considered earned income "for tax purposes." On cross-examination, however, he agreed that the parties did not adopt the tax definition of "earned income" and called that distribution "a non-passive form of investment income."

He described nonpassive income as when a taxpayer materially participates in the business, while passive income means that the taxpayer has an ownership interest in the investment but does not participate in that activity to the level that the IRS requires for it to be nonpassive. When asked: "So you agree that investment income is excluded from the calculations based on the parties' Settlement Agreement?" he responded, "Investment income would be excluded." He conceded that the parties' Settlement Agreement did not distinguish between passive or nonpassive investment income. Thus, according to his testimony, the Tallgrass KC distribution should be excluded from the supplemental support calculations.

Similarly, Hood testified that the funds coming from William's investment in Tallgrass KC "would be clearly investment income, not earned income, within the meaning of the document" and that it should be excluded from supplemental support calculations per the Settlement Agreement. Both parties' experts agreed that the Tallgrass KC income amounting to $895,426 is investment income.

The district court's finding that this amount is not investment income lacks substantial competent evidence to support that conclusion. Its order granting Jody's motion to alter and amend does not state any evidence it relied on in reaching that conclusion. Jody argues that the $895,426 is not investment income because William materially participated in Tallgrass KC and that any income William received from any Tallgrass-related entity that he materially participated in should be included as "earned income." Although Jody's opinion reflects a logical way to define that term, it is contradicted by the definition of "earned income" the parties chose to use in the Settlement Agreement. And Barberich admitted that although William was active in generating the Tallgrass KC income, it is still a kind of investment income. The parties chose to exclude investment income from their definition of "earned income."

13

We find that the $895,426 is directly attributable to William's 9.109% ownership interest in Tallgrass KC and must be considered investment income. Both experts agreed that the $895,426 distribution was a kind of investment income. Because the parties specifically excluded investment income from supplemental support calculations without differentiating between active or passive income, Jody is not entitled to a share of the $895,426.

*Did the District Court Err in Modifying the Settlement Agreement's Supplemental Child Support Provision?*

William claims that the district court erred when it modified the Settlement Agreement's supplemental child support provision. First, he argues that the district court lacked jurisdiction to modify that provision because it is separate and distinct from the base child support provision which follows the Guidelines. Second, he argues that enforcing the remainder of the supplemental child support provision after replacing "earned income" with "domestic gross income" was an error because the district court did not have evidence about the needs of the children in doing so. Third, William argues that if the district court could modify supplemental child support for policy reasons, it should have stricken the entire supplemental child support provision instead of just the limiting language and used the base child support provision to ensure adequate funds for the children.

*Standard of Review*

Whether jurisdiction exists is a question of law over which this court has unlimted review. *In re Care & Treatment of Emerson*, 306 Kan. 30, 34, 392 P.3d 82 (2017). We review a district court's order determining the amount of child support for an abuse of discretion, while we have unlimited review over the interpretation and application of the Guidelines. *In re Marriage of Paul*, 32 Kan. App. 2d 1023, 1024, 93 P.3d 734 (2004),

14

*aff'd* 278 Kan. 808, 103 P.3d 976 (2005). We also exercise unlimited review over issues involving the interpretation of separation agreements, as they are subject to the normal rules of contract law. *In re Estate of McLeish*, 49 Kan. App. 2d at 255.

*Did the District Court Have Jurisdiction to Modify the Supplemental Child Support Provision?*

We first address William's assertion that the district court lacked jurisdiction to modify the supplemental child support provision. The Settlement Agreement has two provisions that involve support for the couple's children. First, the parties agreed to what they called base child support. K.S.A. 2018 Supp. 23-3002(a) provides: "In determining the amount to be paid for child support, the court shall follow the Kansas child support guidelines adopted by the supreme court pursuant to K.S.A. 20-165, and amendments thereto." The parties agree that the base child support provision complied with the Guidelines and specified that its provisions for child support are modifiable and terminable by the court under K.S.A. 23-3001 et seq. William's income, as that term is defined by the Guidelines, exceeded the child support schedules, so the parties considered the extended-income formula then averaged the extended-income formula with the non-extended income formula to reach the amount of child support due under the Guidelines.

Second, the parties provided for supplemental child support in addition to base child support. William was to pay supplemental child support directly to Jody in years when his "earned income" exceeded his salary of $275,000. But the Settlement Agreement's definition of "earned income" for purposes of supplemental child support excludes income from investments and stock options or restricted stock options William may receive and is thus is narrower than the definition of "domestic gross income" required by the Guidelines. The Guidelines define "domestic gross income," as "income from all sources, including that which is regularly or periodically received, excluding public assistance and child support received for other children in the residency of either

15

parent." Guidelines § II.D. (2019 Kan. S. Ct. R. 85). This definition is intentionally broad to include every conceivable form of income whether in the form of earnings, royalties, bonuses, dividends, interest, maintenance, rent, or whatever. See *In re Marriage of Callaghan*, 19 Kan. App. 2d 335, 336, 869 P.2d 240 (1994) (quoting 2 Elrod, Kansas Family Law Handbook §14.024, p. 14-11 [1990]).

The district court, recognizing this distinction, modified the supplemental child support provision, finding that the parties could not use a non-Guidelines definition of income for purposes of child support even for this supplemental provision. It found the parties' agreement unenforceable and revised it by striking "earned income" and its definition and substituting the Guidelines' required "domestic gross income" and its definition. William argues that the district court had no jurisdiction to do so. We agree.

Separation agreements are subject to the normal rules of contract negotiation. *In re Marriage of Hudson*, 39 Kan. App. 2d at 426. As with any other contract, the intent of the parties to a separation agreement governs. 39 Kan. App. 2d at 427. We liberally interpret contracts to carry out the intention of the persons making them. *Ranney v. Ranney*, 219 Kan. 428, 431, 548 P.2d 734 (1976).

But parental child support obligations in a divorce action are governed by statute and guidelines established by our Supreme Court. See generally K.S.A. 2018 Supp. 23-3001 et seq. (governing court's obligation and authority to make provisions for child support); K.S.A. 2018 Supp. 20-165 (mandating Supreme Court to adopt rules establishing child support guidelines); Kansas Supreme Court Administrative Order No. 287, effective September 1, 2016. Parents may make a provision for child support in a separation agreement, but even though the agreement is approved and incorporated into the decree, the court has the power to modify it in the best interests of the child. K.S.A. 2018 Supp. 23-2712; 2 Elrod, Kansas Law and Practice: Kansas Family Law §14:30 (2018). Our statute provides that "any provisions relating to" the support of minor

16

children "shall be subject to the control of the court in accordance with all other provisions of this article." K.S.A. 2018 Supp. 23-2712. Those other provisions require the court, among other matters, to follow the Guidelines in determining the amount to be paid for child support, K.S.A. 2018 Supp. 23-3002, and permit the court to modify prior child support orders. K.S.A. 2018 Supp. 23-3005.

Child support is a right belonging to the child which cannot be reduced or terminated by agreement between parents. *In re Marriage of Schoby*, 269 Kan. 114, Syl. ¶ 1, 4 P.3d 604 (2000); see *Brady v. Brady*, 225 Kan. 485, 488-89, 592 P.2d 865 (1979) ("Divorced parents cannot legally reduce child support or terminate the obligation by a contractual agreement or otherwise. It is a right of the child and can only be reduced or terminated by court order."). Thus parents cannot contractually agree to reduce or terminate a parent's continuing statutory obligation to support minor children. *Thompson v. Thompson*, 205 Kan. 630, 633, 470 P.2d 787 (1970).

But here, the parties did not agree to reduce or terminate child support—they agreed to *increase it* under certain circumstances. The statutorily required amounts of child support were included in the base child support provision. Only the supplemental child support provision defined income differently than did the Guidelines. The apparent purpose for the supplemental provision was to benefit the minor children in years when William's income was greater than $275,000 without making the parties return to court to prove a material change of circumstances. See K.S.A. 2018 Supp. 23-3005(a) (where modification of child support is sought within three years of the original order or a modification of that order, the party seeking modification must demonstrate a material change in circumstances).

We find no similar case in Kansas. Kansas courts have found, however, that they lack jurisdiction to modify provisions in an agreement incorporated into the decree of divorce that extend payment obligations past the statutorily required length of time. For

17

example, we have found that parties may contractually agree to extend maintenance payments beyond 121 months, despite K.S.A. 2018 Supp. 23-2904's statement that "the court may not award maintenance for a period of time in excess of 121 months." See *Johnston*, 54 Kan. App. 2d at 530. This case illustrates the principle that parents may voluntarily agree to do more than the law requires, and that which a court cannot do. Cf. *In re Marriage of Roth*, 26 Kan. App. 2d 365, 369-70, 987 P.2d 1134 (1999) (finding that the court had no jurisdiction to modify the parties' settlement agreement relating to income tax exemptions).

Similarly, a divorce court has no power to continue a provision for support of a child after the child attains the age of majority but the parents may agree to do so. See, e.g., *Morrison v. Morrison*, 14 Kan. App. 2d 56, 60-61, 781 P.2d 745 (1989) (finding if the parents have a written agreement for post-majority support incorporated into the decree of divorce, the trial court has no jurisdiction to modify the periodic support payments after the child has reached the age of 18); *In re Marriage of Williamson*, No. 115,518, 2016 WL 7429527, at *4 (Kan. App. 2016) (unpublished opinion) (finding that when the education expense obligations of a parent extend past the age of majority by an agreement incorporated into the decree of divorce, once the child reaches the age of majority, the trial court lacks jurisdiction to modify the agreement); *In re Marriage of Guthrie-Craig*, No. 113,410, 2016 WL 3128692 (Kan. App. 2016) (unpublished opinion) (finding "[p]arents may contractually agree to extend the payments in a written agreement, but such an agreement between the parties does not extend the court's authority to modify the agreements").

We recognize that Jody and William's child was a minor at the time of trial, and that these child support cases are distinguishable because they are based on statutory language that the court may generally order the child support to be paid "for any child less than 18 years of age." K.S.A. 2018 Supp. 23-3001(b). Nonetheless, these cases reflect the general principles that the court generally lacks jurisdiction to modify an

otherwise valid agreement that provides for child support above and beyond the child support required by the Guidelines, and that a parent has a right to do more for his or her children than the law requires. Parents may contractually agree to extend the payments in a written agreement, but such an agreement between the parties does not extend the court's authority to modify the agreement. See *Bartlett Grain Co. v. Kansas Corporation Comm'n*, 292 Kan. 723, 726, 256 P.3d 867 (2011) ("[P]arties cannot confer subject matter jurisdiction by consent.") (citing *Padron v. Lopez*, 289 Kan. 1089, 1106, 220 P.3d 345 [2009]).

The child support Guidelines do not prohibit a parent from paying more support than the Guidelines require and doing so serves the purpose of the Guidelines:

"And the purpose of the Guidelines is not offended, but rather is aided by allowing divorcing parents to agree to provide greater support for their children. The Guidelines do not constitute the maximum support that a parent may agree to provide for his or her children. Although, as a rule, it is not in the best interest of the children when their parents agree to an amount of child support below the Guidelines, no one can convincingly argue that the best interests of the children are not served when their parents agree to support in excess of the amount established by the Guidelines. Although a court is not bound by such agreements, when parents wish to provide or agree to provide more support than required by law, the Guidelines should not act as a barrier. Furthermore, when the trial court reviews the parties' agreement that requires child support *in excess of the Guidelines,* it is only required to find that the parents, 'having demonstrated knowledge of the amount of child support established by the [Guidelines], have agreed to child support' in excess of the Guidelines." *Pursley v. Pursley*, 144 S.W.3d 820, 825-26 (Ky. 2004) (permitting parties to redefine income for the purpose of determining Father's additional child support obligation).

It is uncontested that William knew the amount required by the supplemental child support agreement exceeded his legal obligation established by the Guidelines.

We apply "'the paramount public policy [] that freedom to contract is not to be interfered with lightly.'" *Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 770, 112 P.3d 81 (2005) (quoting *Weber v. Tillman*, 259 Kan. 457, 474, 913 P.2d 84 [1996]). The parties' Settlement Agreement is an enforceable contract, and a court is not at liberty to revise, modify, or make a different contract from that entered into by the parties. *Fourth Nat'l Bank & Trust Co. v. Mobil Oil Corp.*, 224 Kan. 347, 353, 582 P.2d 236 (1978). An exception may arise when a court acts in equity, see *Stauth v. Brown*, 241 Kan. 1, 11, 734 P.2d 1063 (1987), but the district court did not exercise its equitable jurisdiction here—instead it reformed the parties' agreement because of what it thought the Guidelines required.

The district court lacked the authority to reform the parties' settlement agreement by substituting the Guidelines' definition of domestic gross income for the parties' definition of earned income in the supplemental agreement. The parties did not redefine income for purposes of the child support required by the Guidelines. Instead, they used the Guidelines definition of income for the required child support amounts (base child support), then agreed to pay amounts above and beyond those required by the Guidelines based on a non-Guidelines definition of income (supplemental child support). That agreement does not violate the law.

The district court should have enforced the supplemental child support agreement as written. Because the supplemental child support agreement uses the same definitions of "earned income" as did the supplemental spousal support, the district court should have interpreted its definition of "earned income" in the same way. We find it unnecessary to reach William's other claims of error. We direct the district court to remove the Tallgrass KC payment to William from the calculation of supplemental spousal support, to restore the formula the parties agreed to for supplemental child support, and to remove the Tallgrass KC payment to William from the calculation of supplemental child support.

20

Affirmed in part, reversed in part, and remanded with directions.