(166 P.3d 440)
No. 95,508

In the Matter of the Marriage of FUSAO TAKUSAGAWA, *Appellee*, and MIEKO TAKUSAGAWA, *Appellant*.

Opinion filed September 7, 2007.

*Paul T. Davis,* of Skepnek, Fagan, Meyer & Davis, P.A., of Lawrence, for appellant.

*John M. Knox,* of Knox, Johnson, Rockwell, & Babbit, Chartered, of Lawrence, for appellee.

Before MALONE, P.J., BUSER and LEBEN, JJ.

LEBEN, J.: Mieko Takusagawa appeals the trial court's decision approving and enforcing an oral separation agreement in this divorce case. She raises several claims. First, she claims that she was coerced into making the agreement, a claim the trial court rejected after an evidentiary hearing. Second, she challenges the trial court's failure to inquire directly of the parties about whether the agreement was fair. Third, she argues that the trial court's independent finding that the agreement was fair is in error. Last, she argues that the separation agreement should be held ineffective in transferring interests in real estate on the basis that the parties' oral settlement agreement did not comply with the statute of frauds.

Mieko and Fusao Takusagawa were married in 1977. Fusao filed for divorce in May 2002. A divorce decree was granted on June 23, 2003. Financial issues remained unresolved, however, and a trial on those matters was set for October 15, 2003.

Two days before trial, no settlement had been reached. The events leading up to an apparent settlement were recounted in the trial court's findings:

"Two days before the scheduled hearing, [Mieko] received an email from her adult son, Ken, who forwarded to her a message that he and his sister had received from [Fusao] requesting that the children assist their mother prior to the final hearing with advice about what [Fusao] believed was an illegal action, a purported tax violation which occurred when [Mieko] failed to disclose to United States customs approximately $100,000 U.S.D. in Japanese yen which she brought into the United States from Japan. [Fusao] asked the children to advise [Mieko] about the situation so she could decide whether she wanted to settle the property issues out of court. In the email [Fusao] told the children that his attorney would raise this issue at trial. [Fusao] neither sent the email to [Mieko] nor did he ask their children to do so.

"On the day of the final hearing, the parties reached an agreement and the specifics of the agreement were put on the record. Both parties stated under oath that this was their understanding of the agreement. The hearing concluded with the attorneys agreeing to finalize the settlement paperwork according to the agreed-upon terms.

"[Mieko] later refused to sign the agreement and subsequently filed a motion to set aside the settlement agreement, alleging that [Fusao's] email constituted a threat, that her agreement to the settlement was made under duress or coercion, and that the terms were unfair, unjust, and inequitable and, as such, were void."

The trial judge, the Honorable Jean Shepherd, found no coercion. Judge Shepherd made several specific findings about the weight of the evidence on key issues. She specifically held that there was "no evidence" supporting any of these conclusions:

- that the email "was sent with the purpose of threatening or coercing" Mieko;
- that Fusao "intended to secure an undue advantage over [Mieko] or deprive her of her exercise of free will"; and
- that the email "caused [Mieko] to act to her detriment."

Judge Shepherd held that Mieko had "failed to establish with substantial evidence" that the "email was a threat that induced [her] to act to her detriment under strain of duress or coercion." Judge Shepherd concluded that the terms of the settlement were "highly favorable" to Mieko and that the email "was little more than an attempt to prevent [Mieko's] potential liability from coming to light at the hearing." After finding no basis to set aside the separation

agreement due to coercion, Judge Shepherd approved the agreement as fair and equitable to the parties.

*The Claim of Coercion*

Mieko claims that she felt she had to accept Fusao's settlement offer so that she would not be subjected to potential criminal or immigration sanctions due to her failure to report bringing foreign currency into the country. We must review both the trial court's fact findings and the applicable law to determine whether her claim provides a basis for setting aside the settlement agreement. "When, as here, . . . the district court has made findings of fact as a basis for its legal conclusions, our function merely is to determine whether the findings are supported by substantial competent evidence and whether those findings are sufficient to support the conclusions of law." *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003).

Kansas law has long recognized that a husband and wife may make enforceable agreements during a marriage, even with no divorce action pending. *E.g., In re Estate of Loughmiller*, 229 Kan. 584, 592, 629 P.2d 156 (1981); *Hoch v. Hoch*, 187 Kan. 730, 731, 359 P.2d 839 (1961). Once a divorce action has been filed, K.S.A. 60-1610(b)(3) explicitly sanctions such agreements and provides that any "valid, just and equitable" separation agreement between the parties "shall be incorporated in the [divorce] decree." These agreements are subject to the normal rules of contract law, *Drummond v. Drummond*, 209 Kan. 86, 91, 495 P.2d 994 (1972), and may be set aside when one of the parties entered into the agreement under duress or coercion. *Libel v. Libel*, 5 Kan. App. 2d 367, 368, 616 P.2d 306 (1980).

Judge Shepherd concluded factually that Mieko's entry into the agreement was not due to duress or coercion. We have previously set out in some detail her specific findings. After review of the transcript of both hearings and the full record, it is clear that her findings are supported by substantial competent evidence.

Given Judge Shepherd's fact findings, it is equally clear that the applicable legal standard cannot be met in this case; the standard for setting aside a separation agreement based on a claim of duress

or coercion is not a low one. As Professor Linda Elrod and the late Judge James Buchele have aptly noted, "[s]ome degree of pressure exists in every negotiation." 2 Elrod & Buchele, Kansas Law and Practice: Kansas Family Law § 11.32 (1999). Thus, this court determined in *Libel* that to constitute duress so as to justify setting aside an otherwise valid agreement, the threats must be purposely coercive, designed to secure undue advantage, deprive the other party of the exercise of free will, and cause the other party to act to his or her detriment. *Libel*, 5 Kan. App. 2d at 368, (citing *Motor Equipment Co. v. McLaughlin* , 156 Kan. 258, Syl. ¶ 1, 133 P.2d 149 [1943]). The factual record in this case does not support such a claim.

### The Claim of Inadequate Inquiry of the Parties by the Judge

Mieko next argues that the agreement should be set aside because the trial judge did not ask each of the parties whether he or she considered the settlement a fair one. This issue raises questions of interpretation of the Kansas divorce statutes. Thus, this court's review is unlimited. See *Foster v. Kansas Department of Revenue*, 281 Kan. 368, 374, 130 P.3d 560 (2006).

In support of her argument, Mieko relies upon a West Virginia case, *Gangopadhyay v. Gangopadhyay*, 184 W. Va. 695, 403 S.E.2d 712 (1991). In that case, the West Virginia Supreme Court of Appeals held that a trial judge must make "inquiries . . . to ascertain that the parties understand [the] terms and have voluntarily agreed to them without any coercion" before an oral settlement agreement may be approved. 184 W. Va. at 699.

We do not find the *Gangopadhyay* case persuasive in Kansas because there is a key difference between the West Virginia statutes discussed in that case and the statutes of Kansas. West Virginia's statute literally required that all divorce separation agreements be in writing. 184 W. Va. at 696. After noting this statutory requirement and several "cogent policy reasons which cause us to encourage the use of written separation agreements," 184 W. Va. at 698, the court concluded that "[f]or these reasons . . . certain safeguards should attend the acceptance of an oral separation agreement." 184 W. Va. at 699.

Unlike West Virginia, Kansas has no statute requiring that separation agreements be made in writing. Although it is difficult to prove a negative—and the Kansas statute does not explicitly reference oral separation agreements—both of the leading practice treatises note that Kansas allows oral separation agreements. 2 Elrod & Buchele, Kansas Family Law § 11.31; Short, Settlement Agreements, in Practitioner's Guide to Kansas Family Law § 8.12 (Leben ed. Supp. 2002). This is a crucial distinction between the rationale of the *Gangopadhyay* court and the case now before us.

This court has previously recognized that there are some explicit procedural and substantive requirements in the Kansas divorce statute. Substantively, K.S.A. 60-1610(b)(3) allows approval of a separation agreement only if the "court finds [it] to be valid, just and equitable." Procedurally, in *In re Marriage of Kirk*, 24 Kan. App. 2d 31, 941 P.2d 385, *rev. denied* 262 Kan. 961 (1997), we held that there must of necessity be some basis in the record for this conclusion. Thus, there must be "evidence in the record sufficient to support the finding that the separation agreement is valid, just, and equitable." 24 Kan. App. 2d 31, Syl. ¶ 1. If we demanded that trial judges go through a new set of magic questions before accepting a separation agreement, then we would be adding a requirement to the Kansas divorce statutes that simply cannot be found in the text. So long as there is a sufficient evidentiary basis in the record from which the trial court can determine that a valid contractual agreement was reached and that this agreement is fair, no more is required.

*The Claim of Error in Finding the Agreement to Be Fair*

Mieko next argues that the district court erred when it concluded that the separation agreement was just and equitable, a statutory requirement under K.S.A. 60-1610(b)(3). She contends that "[a] strong argument can be made that maintenance is appropriate" here given the length of the marriage and disparity in income between the parties. She also contends that her inheritance should not have been considered marital property and factored into the court's analysis of the fairness of the agreement.

When a separation agreement is submitted for court approval, the trial judge is given broad discretion to determine its fairness. *Kirk*, 24 Kan. App. 2d at 35-36. Thus, we review the fairness decision for abuse of discretion. If reasonable people could disagree about the appropriateness of the trial court's decision, then no abuse of discretion has occurred. *In re Marriage of Bradley*, 282 Kan. 1, 7, 137 P.3d 1030 (2006).

Mieko's objection to consideration of the inherited property as part of the marital estate subject to division presents only an argument of abuse of discretion in determining fairness, not a legal objection. Kansas law clearly provides that all property of the parties, however and whenever acquired, comes under the jurisdiction of the divorce court and may be equitably divided between them. K.S.A. 2006 Supp. 23-201(b); *In re Marriage of Rodriguez*, 266 Kan. 347, 352-53, 969 P.2d 880 (1998). Thus, our review on this issue is solely for abuse of discretion.

In cases tried rather than settled, Kansas law does not require an equal division of marital property. Rather, it is simply the judge's obligation to arrive at a "just and reasonable division." *Rodriguez*, 266 Kan. at 353. In cases settled, we know that the parties to a case have greater understanding of the circumstances of their case than any judge ever could gain through trial. Thus, the parties certainly have the ability to craft a settlement that does not equally divide their property or otherwise apply mechanical rules in determining the proper outcome.

The trial court in this case had before it all of the material required by the *Kirk* decision. Each party had submitted a domestic relations affidavit containing income information and property valuations. Fusao had also complied with Douglas County Local Rule 11, which required the filing of a statement containing a proposed division of property accompanied by values of each item. Judge Shepherd and counsel explicitly tracked the oral settlement agreement against that Rule 11 listing at the October 2003 hearing in which the settlement was announced.

At the time of filing, Fusao was earning about $84,500 as a professor and Mieko was earning about $49,000 as a pharmacist. Mieko's domestic relations affidavit indicated that her employment

would end in December 2002 when her employer discontinued its pharmacy. There is no indication in the record as to what steps she had taken, if any, to obtain replacement employment. Although there were differing valuations provided for the property Mieko had inherited in Japan, Mieko ended up with greater assets than Fusao no matter what valuation was used. Using the most conservative valuation of the Japanese property, Mieko received assets worth at least $670,000; using the highest estimate, she may have received assets worth almost $1,500,000. Fusao received assets worth about $629,000. Neither party listed any debts.

Judge Shepherd ultimately concluded that the settlement agreement was "highly favorable" to Mieko. Its financial provisions were certainly well within the range of reasonable results that parties represented by counsel may arrive at through negotiation. There was no abuse of discretion in concluding that the agreement was a fair one to both parties.

*The Claim of Violation of the Statute of Frauds*

Mieko's final claim raises a question not addressed in any published Kansas appellate opinion: May a party use the statute of frauds to avoid enforcement of an oral divorce settlement agreement that was recited and acknowledged on the record in court if an agreement to transfer land title was a part of the deal?

To be sure, no purpose behind the statute of frauds would be served by allowing Mieko to avoid enforcement of this agreement. The statute of frauds is designed to prevent fraud, *Ayalla v. Southridge Presbyterian Church*, 37 Kan. App. 2d 312, 316, 152 P.3d 670 (2007), and there is certainly no fraud at work here. Mieko admits that she entered into the agreement.

Of course, that does not answer the question of whether the statute of frauds bars enforcement of the agreement. Two provisions within the statute of frauds have been cited here by the parties. K.S.A. 33-105 requires a written deed or note for a transfer of interests in land. K.S.A. 33-106 requires some written evidence of an agreement for the sale of lands or any interest in them. The agreement between Mieko and Fusao did not actually transfer land interests. Rather, as part of an overall exchange of assets, it set up

a process under which certain of Mieko's interests in land in Japan would be transferred to Fusao at a later date. Thus, K.S.A. 33-106 is the applicable statutory provision.

Under K.S.A. 33-106, no action may be brought on a contract for the sale or transfer of interests in land "unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized in writing." Here, the terms of the agreement were recited by the authorized agents of the parties, their attorneys, into the court record. When the transcript was prepared, there was thus "some memorandum or note thereof" in writing. The memorandum evidencing the agreement may be made after formation of the contract. Restatement (Second) of Contracts § 136 (1979).

But was the agreement *signed* by Mieko, the party against whom it would now be enforced? At first blush, the answer seems to be no. There was no transcript at the time the agreement was recited into the record so obviously she didn't take pen in hand and sign it then. And when a formal separation agreement was prepared, Mieko refused to sign it.

Answering the signature question requires consideration of the purpose of the requirement and the long march of caselaw interpretation under the statute of frauds. Our statute of frauds traces its lineage to virtually identical language adopted by the English Parliament in 1677. As an English judge put it nearly a century ago, "It is now two centuries too late to ascertain the meaning [of the statute of frauds] by applying one's own mind independently to the interpretation of its language. Our task is a much more humble one; it is to see how that section has been expounded in decisions and how the decisions apply to the present case." *Hanau v. Ehrlich*, 2 K.B. 1056, 1069 (1911). The clear trend over the years has been toward a narrowing interpretation of the statute of frauds. See 4 Corbin on Contracts § 12.1 (rev. ed. 1997); Murray on Contracts § 68 (4th ed. 2001).

That trend toward a narrow construction was apparent in Kansas in 1921 when our Supreme Court decided *Whitlow v. Board of Education*, 108 Kan. 604, 196 Pac. 772 (1921), a case of substantial importance to our question. In *Whitlow*, a school board voted at a meeting to sell a parcel of land. When Whitlow brought her check to complete the purchase, the school board refused to proceed with the sale. The board's minutes showed that the motion to sell the lot to Whitlow had been made and passed and that it authorized the board president to sign a deed in exchange for Whitlow's payment. The Supreme Court rejected the school board's argument that the statute of frauds precluded enforcement of the agreement because no member of the board had signed the minutes:

"There can be no doubt that the defendant board had the power to make this contract [citation omitted], and that it did make it. The minutes of the board as recorded by the clerk are the authentic record which the law required to be kept. . . . Those minutes constituted a sufficient memorandum of the contract to bind the board under the statute of frauds [citation omitted]. The duly recorded minutes fairly answered every purpose of that statute. [Citations omitted.]" 108 Kan. at 608.

The purpose of the signature requirement is to "authenticate the writing as that of the signer." Restatement (Second) of Contracts § 134. Thus, the Supreme Court in *Whitlow* found a signature unnecessary when there was a legally required public record that provided authentication of the formation and terms of the contract.

Our case is quite similar. The district court is a court of record, K.S.A. 20-301, and this court has held that the district court's "record imports verity and cannot be collaterally impeached." *In re Marriage of Case*, 18 Kan. App. 2d 457, Syl. ¶ 1, 856 P.2d 169 (1993). A properly certified transcript of a court hearing is superior to the minutes taken down by the school board's clerk in *Whitlow*. Thus, we find that a signature is unnecessary when there is a court transcript providing the terms of the agreement and the oral assent of the party to be charged with the agreement that has been fairly stated on the record of that proceeding.

This is fully in keeping with the purpose of the signature requirement in authenticating the writing. As a leading contract treatise explains, the "signature requirement should be held to be sat-

isfied if the writing contains any sign or symbol identifying its maker so as to persuade the court that there is no serious risk of fraud in the . . . allegation that the memorandum was made or adopted by the party charged." 4 Corbin on Contracts § 23.4, at 788. The transcript shows that the judge asked Mieko, "Ma'am, is that your understanding of the agreement?" She replied, "Yes." That response was her sign or symbol authenticating the agreement that had just been recited to the court. As the court recognized in *Whitlow*, the authenticity of that sign or symbol is not lessened when it is accurately taken down by a public official whose duty it was to record the proceeding rather than being handwritten by the party.

Several additional considerations reinforce our conclusion that the statute of frauds is no bar to enforcement of this agreement. First, Kansas' adoption in 2000 of the Uniform Electronic Transactions Act (UETA), K.S.A. 2006 Supp. 16-1601 *et seq.*, probably makes Mieko's in-court statement the legal equivalent of a written signature for purposes of the statute of frauds. The record does not disclose the type of equipment used by the court reporter, but it would be quite rare today for a court reporter's equipment not to at least require electricity. The UETA deems records generated by electronic means, including the use of electrical or digital magnetic capabilities, to be electronic records. K.S.A. 2006 Supp. 16-1602(f), (h). The UETA also deems any electronic sound or symbol "adopted by a person with the intent to sign the record" to be an "electronic signature." K.S.A. 2006 Supp. 16-1602(i). The UETA then provides that when a law requires a record or a signature to be in writing, an electronic record or signature will satisfy the law. K.S.A. 2006 Supp. 16-1607(c), (d). Thus, assuming that the court reporter's equipment was consistent with modern practice, it would appear that the electronic capture of Mieko's oral assent that this was the agreement would satisfy the statute of frauds. No more is needed to show that Mieko made or adopted the agreement. See 4 Brown, Corbin on Contracts § 23.1A (Supp. 2007).

Second, as we have already noted, Kansas law allows for oral separation agreements in divorce cases. K.S.A. 60-1610(b)(3) then provides that such agreements be incorporated into the decree of

divorce if approved by the judge. It would be odd, indeed, if a settlement agreement incorporated under statutory authorization into a court order were to be held unenforceable for failure to comply with the statute of frauds—at least when that oral settlement was placed on the record and acknowledged by the parties in open court.

Third, additional statutory and caselaw developments over the past few decades support an exception to applicability of the statute of frauds when a judicial admission of the agreement has been made. The key statutory development has been Uniform Commercial Code § 2-201, adopted in 1965 in Kansas as K.S.A. 84-2-201. It explicitly provides a judicial-admission exception to the statute of frauds for cases covered by the UCC. Because statutes on the same subject are *in pari materia* and are to be construed to achieve consistent results whenever possible, *Newman Mem. Hospital v. Walton Constr. Co.*, 37 Kan. App. 2d 46, 67-68, 149 P.3d 525 (2007), the general statute of frauds and the UCC statute of frauds should be construed in similar ways to the extent possible. Thus, if possible, the general statute of frauds should be interpreted to include a judicial-admission exception since the UCC statute of frauds has one.

For example, the United States Court of Appeals for the Tenth Circuit relied in part on an analogy to the UCC provision when it concluded that a general exception to the Oklahoma statute of frauds existed for judicial admissions in *Gibson v. Arnold*, 288 F.3d 1242, 1246-47 (10th Cir. 2002). The Tenth Circuit noted that "virtually every court that has addressed the issue during the last twenty-five years has held that judicial admissions are an exception to the statute of frauds." 288 F.3d at 1246. Here, Mieko's in-court statement was a judicial admission and acknowledgment of the agreement.

Fourth, several courts either have held that the statute of frauds has no application at all to lawsuit settlements either supervised by a court settlement process or recited into the record in open court, see *e.g.*, *Kohn v. Jaymar-Ruby, Inc.*, 23 Cal. App. 4th 1530, 28 Cal. Rptr. 2d 780 (1994) (statute of frauds inapplicable to oral settlement stipulated to before court after formal settlement confer-

ence); *Fuchs v. Fuchs*, 65 App. Div. 2d 595, 409 N.Y.S.2d 414 (1978) (statute of frauds inapplicable when transcript of proceedings establishes terms of oral settlement); *Owens v. Lombardi*, 41 App. Div. 2d 438, 343 N.Y.S.2d 978 (1973) (same), or have used a purposive approach to statutory interpretation to hold that the statute of frauds should not be interpreted to allow avoidance of a lawsuit settlement recorded in court. See *Brockman v. Sweetwater County School Dist. No. 1*, 826 F. Supp. 1328 (D. Wyo. 1993), *aff'd*, 25 F.3d 1055 (10th Cir. 1994), *cert. denied* 513 U.S. 951 (1994). Application of those precedents also would result in enforcement of the oral settlement agreement.

We turn last to the authorities cited by Mieko. On the facts of our case, the New Mexico authorities she has cited, *Tellez v. Tellez*, 51 N.M. 416, 186 P.2d 390 (1947), and *Herrera v. Herrera*, 126 N.M. 705, 974 P.2d 675 (1999), do not suggest a contrary result. *Tellez* involved an attempt to enforce a *premarital* oral agreement involving real estate. 51 N.M. at 418. The dispute arose after the promisor-husband died and his widow learned that he had conveyed the real estate to his children and grandchildren, contrary to the claimed oral promise to leave it for her. 51 N.M. at 418. The oral agreement in contemplation of marriage was held subject to the statute of frauds, 51 N.M. at 419-20, an unsurprising finding that is not analogous to our case in which a *postmarital* settlement agreement was reached and recited on the record before a judge. In *Herrera*, the court did conclude that the statute of frauds applies to marital settlement agreements. 126 N.M. at 708. But the court applied the judicial-admission exception to the statute of frauds to enforce the agreement since the party against whom the agreement was being enforced admitted in testimony that he had agreed to the terms of the oral agreement and had thought them to be fair. 126 N.M. at 709-10.

We need not reach the *Herrera* court's conclusion that the statute of frauds applies to marital settlement agreements. A court should generally address only the limited issues that must be resolved to decide the case before it. As we have already demonstrated, if the statute of frauds is applicable, as the *Herrera* court held, the statute was complied with in our case. Even if it had not

been literally complied with, however, both the *Herrera* opinion cited by Mieko and the other authorities we have cited would support applying the judicial-admission exception and enforcing the oral agreement. Similarly, the separate line of cases we have cited finding that the statute of frauds does not apply to court-supervised settlements recited in open court would also support enforcing the oral agreement.

Affirmed.