(182 P.3d 25)
No. 97,035

In the Matter of the Marriage of BRENDA S. LOSCHER (f/k/a Hudson), *Appellee,* and WILLIAM B. HUDSON, *Appellant.*

Opinion filed April 18, 2008.

*Diana L. Miller,* of McCollum & Parks, L.C., of Fairway, for the appellant.

*Allan E. Coon* and *Gregory D. Kincaid,* of Norton, Hubbard, Ruzicka & Kreamer L.C., of Olathe, for the appellee.

Before MALONE, P.J., PIERRON, J., AND BUKATY, S.J.

PIERRON, J.: William B. Hudson appeals the district court's finding that his agreement to indemnify Brenda S. Loscher in their separation agreement for a deficiency that remains on their second mortgage includes Loscher's payments for criminal restitution on that deficiency. We affirm.

In 1999, Loscher and Hudson purchased a home for approximately $354,500. Loscher prepared a mortgage loan application for Norwest Mortgage, claiming that she and Hudson would use their own funds to make a down payment of approximately $153,000. In support of her application, Loscher provided a falsified bank statement indicating that she and Hudson had $2,647.10 and $157,145.34 in their checking and savings accounts, respectively. In reality, they only had $838.87 in their checking and $4 in their savings accounts.

At the time of closing, Loscher called Shirley Hudson (Loscher's mother-in-law who lived in Colorado) for a short-term loan of $150,000. Loscher told Shirley that the bank was improperly holding funds that she intended to use for the down payment of the house, which was untrue. Based on the understanding that Loscher would repay the loan within days, Shirley agreed to provide them a loan. Shirley obtained a 30-day bank loan and wired the funds to Loscher who used the funds for the down payment.

After Loscher and Hudson moved into their new home, Loscher did not repay the loan to Shirley. Instead, she undertook several actions to circumvent her repayment obligation.

First, Loscher told Shirley's bank that she had the money and would send the check via Federal Express. The bank, however, checked with Federal Express and, finding no record of the shipment, contacted Loscher. In response, Loscher faxed false copies of the Federal Express Airway bill and the payoff check and mailed an empty Federal Express envelope to the bank.

Second, Loscher began fraudulently using the identity of an attorney, faxing multiple letters and making telephone calls to the bank and Shirley. Purporting to be the attorney or the attorney's assistant, Loscher stated she was aggressively pursuing the release

of Loscher and Hudson's funds. Loscher also forged the attorney's signature.

Third, Loscher interfered with Hudson being contacted by Shirley or his other family members to discuss the loan/down payment matter. Loscher refused to relay telephone messages left for Hudson in their home; deleted messages left for Hudson on the voice mail system at his old office; and falsely informed family members that Hudson did not have a telephone in his new office.

Loscher's nonrepayment of the loan forced Shirley to cash out several certificates of deposit to repay the bank. Shirley then placed a second mortgage on Loscher's and Hudson's home. Once the home was sold, Shirley recovered $87,402.55, leaving a difference of $66,000.84 unpaid.

For this reason and others, Loscher and Hudson divorced. Incorporated into their November 21, 2000, divorce decree, the separation agreement contained a hold harmless provision stating that Hudson would be liable for any deficiency that existed from the parties' second mortgage to Shirley.

"III. PROPERTY DIVISION

. . . .

"5. **REAL PROPERTY**
      "MARITAL RESIDENCE
      "The real property owned by the parties, commonly known as 13701 West 54th Terrace, Shawnee, Kansas, and legally described as:

**LOT 3, BLOCK 2, Woodland Place, a subdivision in the City of Shawnee, Johnson County, Kansas, according to the recorded plat thereof.**

is currently on the market for sale.

      "The marital residence is currently encumbered by a first mortgage to Norwest Mortgage Company in the approximate sum of $203,000, and a second mortgage to Shirley Hudson in the sum of $150,000. The marital residence has an approximate market value of $369,000.

      "As of November 1, 2000, Husband shall control the listing and marketing of the sale of the marital residence. *Once the marital residence is sold, in the event a deficiency exists with regard to the second mortgage, Husband shall completely satisfy any such deficiency and hold wife harmless therefrom.*" (Emphasis added.)

In entering into the agreement, the parties specified their general intent was as follows:

"I. RECITALS

"As the premises of this Agreement, the parties state:

. . . .

"5. **GENERAL INTENT OF MARITAL SETTLEMENT**. The parties intend to settle all rights or claims between them arising out of their marriage relationship, including but not limited to property division, maintenance, and inheritance rights."

Sometime afterwards, the United States Attorney for the District of Colorado filed multiple charges against Loscher for her unlawful acts related to the nonrepayment of Shirley's loan. In 2004, Loscher entered a plea of guilty to one count of wire fraud. In exchange for her plea, the United States Attorney agreed to dismiss the remaining counts and not file any other federal criminal charges against Loscher. Because Loscher stated that she was freely and voluntarily pleading guilty to the crime and because she was guilty of the crime, and for no other reason, the United States District Court for the District of Colorado accepted her guilty plea.

For her sentence, the federal district court applied the Mandatory Victims Restitution Act of 1996 (MVRA) and ordered full restitution. Under 18 U.S.C. § 3663A (2000), the court sentenced Loscher to a 5-year term of probation with restitution in the amount of $66,000.84 to be owed to Shirley as a condition of probation. A special assessment of $100 was also ordered against Loscher.

However, for the reason that additional financial obligations would hamper Loscher's ability to pay her criminal restitution, the federal district court declined to further impose a fine against Loscher, which could have ranged from $2,000 to $20,000, or require interest for the restitution.

Because Loscher's criminal restitution was in the amount of the deficiency remaining on the second mortgage to Shirley, Loscher filed an accusation in contempt against Hudson in the divorce case. In her contempt claim, Loscher argued that Hudson's failure to satisfy the second mortgage to Shirley as assigned by the hold harmless provision required the district court to impose a judgment against Hudson in the amount of $66,000.84. In response, Hudson maintained that while Loscher's court-ordered criminal restitution

did not relieve him of his obligation under the hold harmless provision, Loscher's sentence did not require him to perform his contractual obligations.

After hearing evidence on the matter, the district court classified the $66,000.84 as restitution, which represented the deficiency owing for the second mortgage. Under that assessment, the court declined to find Hudson in contempt but interpreted the hold harmless provision to mean that Hudson's liability encompassed any event in which Loscher would be found liable for the deficiency. Consequently, because Loscher's criminal restitution made her liable for the deficiency of the second mortgage, the court enforced the hold harmless provision. The judge noted:

"Clearly the $66,000.84 that [Loscher] is required to pay as restitution to [Shirley] was explained by Mr. Kirsch, the government attorney in Colorado. It is for the deficiency payment on the second mortgage.

"Clearly in the separation agreement, [Hudson] agreed to hold [Loscher] harmless from payment of any deficiency on the second mortgage. I'm not going to give him a judgment for $66,000 against—I'm not going to give her a judgment for that amount. He needs to hold her harmless. So she is paying 200 bucks a month so now you reimburse her 200—every payment she makes, prove you made the payment, and I'll give you 30 days to reimburse her. That money is going to your mother. . . .

. . . .

"I'll order that the [$1600 that has been paid] be reimbursed upon proof of payment, restitution payment to the court in Colorado. . . .

. . . .

"But an accusation in contempt is very specifically, specific accusations and the Court cannot find that he's in willful violation of the Court's—of the decree of divorce and the settlement agreement in this matter. There is no clear demand for reimbursement of the 1600 and 200 per month payments. So I'm not going to find him in contempt of the court.

"The Court does consider this in lieu of the contempt a motion to interpret the decree of divorce which is what I've done. He's agreed to indemnify her. She is paying these monthly payments and he needs to reimburse her. He has agreed to do that. So I'm not finding him in contempt but I do—I have made orders that have interpreted and it's basically a motion to enforce, I guess, a motion for contempt or a motion to enforce so that's the way the Court intends to attempt to enforce the agreement."

On February 3, 2006, the journal entry memorializing these findings was entered.

On February 17, 2006, Hudson filed a motion to alter or amend judgment under K.S.A. 60-259(f), requesting the district court modify its previous interpretation of the hold harmless provision since the previous hearing began as a contempt citation and not as a motion to enforce, reinterpret, or modify the hold harmless provision in the property settlement agreement. After conducting a hearing on May 4, 2006, the district court denied Hudson's motion to reconsider:

> "It appears to the Court that this 150,000 loan, the second mortgage is something that [Hudson] was aware of, that the forgery and all these things [Hudson] is complaining about now is something he was aware of, that the separation agreement appears to the Court to have been entered into subsequently and right in there they talk about the second mortgage of Shirley . . . . It appears to me that the mistake is, if any, was what they believe the market value of the house was."

On June 13, 2006, the district court entered its journal entry on the matter. This appeal followed.

As a preliminary matter, Loscher raises two arguments why this court should not review the district court's interpretation of the hold harmless provision and Hudson's briefed arguments.

Because Hudson's notice of appeal does not specifically identify the district court's February 3, 2006, order interpreting the hold harmless provision, Loscher argues that this court's review is limited to only the issues concerning the district court's denial of Hudson's motion to alter or amend.

Jurisdiction to hear an appeal is conferred by statute. The interpretation of a statute is a question of law over which an appellate court has unlimited review. *Foster v. Kansas Dept. of Revenue*, 281 Kan. 368, 374, 130 P.3d 560 (2006).

K.S.A. 60-2103(b) provides: "The notice of appeal shall specify the parties taking the appeal; *shall designate the judgment or part thereof appealed from,* and shall name the appellate court to which the appeal is taken." (Emphasis added.) The presence of these requirements should be broadly construed "to secure the just, speedy, and inexpensive determination of every action or proceeding" as required by the code of civil procedure. *Hess v. St. Francis Regional Med. Center*, 254 Kan. 715, 720, 869 P.2d 598 (1994). Thus, under this liberal construction, our appellate courts have

recognized that the utilization of catchall language for matters appealed from a notice of appeal can be sufficient to satisfy the "shall designate the judgment appealed from" requirement to perfect appeals from otherwise undesignated rulings. *Gates v. Goodyear*, 37 Kan. App. 2d 623, Syl. ¶ 2, 155 P.3d 1196, *rev. denied* 284 Kan. 945 (2007); see also *Key v. Hein, Ebert & Weir, Chtd.*, 265 Kan. 124, 128-30, 960 P.2d 746 (1998).

Here, Hudson's notice of appeal states that he is appealing "from certain judgments entered herein on May 4, 2006, as set forth in the Journal Entry filed on June 13, 2006; *and all previous rulings and orders on all issues decided therein* to the Court of Appeals of the State of Kansas." (Emphasis added.) Hudson's identified rulings only pertain to the district court's rulings over his motion to alter or amend judgment. Therefore, Hudson requests this court to construe "and all previous rulings and orders on all issues decided therein" as catchall language that encompassed the February 3, 2006, judgment.

On this issue, *Key* is particularly instructive. In *Key*, the pro se appellant filed a notice stating he appealed from the district court's December 19, 1996, order and " 'from each and every order entered contrary to plaintiff.' " Importantly, the December 1996 order referenced Key's motion for new trial or to amend the judgment and not the underlying December 1995 summary judgment ruling. As a result, the appellees sought to limit the appeal to issues only concerning Key's motion for new trial or to amend the judgment.

The court in *Key*, however, declined to adopt the appellees' position. Applying a liberal approach, the court construed Key's notice of appeal to include references to both the December 1995 and the December 1996 orders. Specifically, in regards to the unidentified December 1995 ruling, the court held that Key's inclusion of the catchall language in his notice of appeal "obviously embrace[d] the entry of summary judgment." 265 Kan. at 129-30.

In this case, similar to *Key*, Hudson identified the district court's rulings over his motion to alter or amend the judgment but not the underlying judgment. The underlying judgment was the February 3, 2006, order. Importantly, this order and the identified rulings

centered on the same matter—Hudson's liability over the deficiency. Thus, in broadly construing Hudson's notice of appeal, it is clear that Hudson's utilization of "and all previous rulings and orders on all issues decided therein" encompassed the underlying February 3, 2006, order of the identified rulings. Furthermore, contrary to Loscher's claim that Hudson "submitted a hopelessly vague jurisdictional invocation," Hudson's use of "therein" provided adequate notice that Hudson's notice of appeal would be restricted to orders that touched upon Hudson's liability over the deficiency." See Black's Law Dictionary 1517 (8th ed. 2004) (defining "therein" to mean: [1] "In that place or time;" [2] "Inside or within that thing; inside or within those things;" or [3] "In that regard, circumstance, or particular").

Loscher further argues that this court is barred from reviewing Hudson's briefed appellate arguments. Loscher first points out that Hudson raised these appellate arguments in his motion to alter or amend and not at the contempt hearing and, thus, misused the motion to alter or amend to raise new issues not made at trial. Accordingly, Loscher claims that Hudson's briefed issues were not properly raised before the district court and now cannot be raised on appeal. As an alternative argument, Loscher asserts that Hudson's position at the motion hearing was inconsistent with his position at the contempt hearing. Therefore, Loscher claims that judicial estoppel applies.

In response, Hudson contends that the arguments briefed in his motion to alter or amend merely augmented the same issue he advanced at the contempt hearing. As such, Hudson maintains that the motion to alter or amend was the appropriate vehicle to raise additional reasons why the district court should correct its previous ruling. Hudson further asserts that he has never changed his position that he is not liable for Loscher's criminal restitution under the hold harmless provision throughout both hearings. For that reason, Hudson claims that judicial estoppel does not apply.

"The purpose of a motion to alter or to amend under K.S.A. 60-259(f) is to allow a trial court an opportunity to correct prior errors." *Antrim, Piper, Wenger, Inc. v. Lowe*, 37 Kan. App. 2d 932,

939, 159 P.3d 215 (2007); *Denno v. Denno*, 12 Kan. App. 2d 499, 501, 749 P.2d 46 (1988).

In this case, the record supports Loscher's claim that Hudson's arguments in his brief were first raised during his motion to alter or amend. However, as stated by Hudson, these arguments did not concern new issues. Rather, Hudson's arguments consisted of policy and legal reasons used to persuade the district court to correct its previous interpretation of the hold harmless provision in the context of Loscher's criminal restitution. Importantly, Hudson was not provided the opportunity to raise these arguments at the contempt hearing because, after finding that Hudson was not in contempt, the district court construed Loscher's accusation of contempt to be a motion to interpret the hold harmless provision. Therefore, these policy and legal reasons fell within the purpose of a motion to alter or amend; thus, this court is not prohibited from reviewing these same arguments on appeal.

A party can only assert judicial estoppel when all four elements are satisfied: "(1) a position taken must contradict a declaration in a prior judicial action; (2) the two actions must involve the same parties; (3) the party asserting the theory must have changed its position; and (4) the changed position must have been in reliance on the prior statement. [Citation omitted.]" *Knorp v. Albert*, 29 Kan. App. 2d 509, 518, 28 P.3d 1024 (2001).

Here, at the contempt hearing, Hudson stated that he remained responsible for the civil liability to Shirley for the deficiency but that his obligation under the hold harmless provision did not include Loscher's payments of criminal restitution to Shirley. At the motion hearing, Hudson briefed additional policy and legal reasons to support the same claim. Consequently, it is clear that Hudson's position in the matter remained consistent—judicial estoppel does not apply.

Because Hudson does not concede that the hold harmless provision includes Loscher's criminal restitution, this appeal appears to raise an issue of first impression: When a husband agrees to indemnify his wife for a mortgage debt in their separation agreement and the former wife later pleads guilty to a criminal act that requires her, as part of her sentence, to pay criminal restitution in

the amount of that mortgage debt to the victim-mortgagor, is the former husband required to reimburse the former wife for that court-ordered criminal restitution?

Contrary to Loscher's claim, Hudson is not seeking to set aside the separation agreement as incorporated into the divorce decree, which would require the filing of a K.S.A. 60-260(b) motion. See K.S.A. 60-260(b). Rather, on appeal, Hudson is objecting to the district court's interpretation that the hold harmless provision encompassed Loscher's payments of criminal restitution. As stated above, this court has jurisdiction to review the district court's February, 3, 2006, order. Therefore, to the extent the issue involves the interpretation and legal effect of the parties' separation agreement, which are matters of law, this court applies a de novo standard of review. *In re Marriage of Gurganus*, 34 Kan. App. 2d 713, 717, 124 P.3d 92 (2005).

Separation agreements are subject to the normal rules of contract law. *Drummond v. Drummond*, 209 Kan. 86, 91, 495 P.2d 994, (1972) (holding that a separation agreement is subject to the same rules of law applicable to other contracts); *In re Marriage of Takusagawa*, 38 Kan. App. 2d 401, 403, 166 P.3d 440, *rev. denied* 285 Kan. 1174 (2007) (recently citing *Drummond's* rule of law). The fact that a separation agreement is incorporated into a divorce decree does not extinguish those contractual aspects. *Dozier v. Dozier*, 252 Kan. 1035, 1039, 850 P.2d 789 (1993) ("The law in this state is that a contract between the parties to a divorce action that is approved by the trial court and merged into the judgment also retains its contractual characteristics."); *In re Marriage of Wessling*, 12 Kan. App. 2d 428, 430, 747 P.2d 187 (1987) (stating that a property settlement agreement incorporated into a divorce decree is a hybrid in law having the characteristics of a judgment and a contract).

Furthermore, a hold harmless provision in a separation agreement is the same as an indemnity agreement. See *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 642, 666 P.2d 192 (1983) (stating that one of the traditional situations in which claims of indemnity are allowed is when there is an expressed contract of indemnity, such as a hold harmless agreement); see also *Long v.*

*McAllister-Long*, 221 S.W.3d 1, 10 (Tenn. App. 2006) (stating that the term "hold harmless" is synonymous with the word "indemnify," and thus, a hold harmless provision in a decree or marital dissolution agreement is nothing more or less than an indemnity agreement). But see *In re Marriage of Plesich*, 881 P.2d 379, 381 (Colo. App. 1994) (holding that a hold harmless provision that is imposed by the trial court as part of an equitable distribution of the parties' marital assets and liabilities must be construed consistent with the public policies underlying the Colorado Uniform Dissolution of Marriage Act rather than with indemnity contract law). The rules governing the interpretation and construction of indemnity agreements are also the same as those relating to other types of contracts. *Chetopa State Bancshares, Inc. v. Fox*, 6 Kan. App. 2d 326, 331, 628 P.2d 249, *rev. denied* 229 Kan. 669 (1981); see also *Hartford Fire Ins. Co. v. P & H Cattle Co., Inc.*, 451 F. Supp. 2d 1262, 1276 (D. Kan. 2006). Therefore, an indemnity provision in a separation agreement is construed and enforced like other contracts. See *In re Marriage of Gurganus*, 34 Kan. App. 2d at 717 (applying contract principles to the interpretation of a property settlement agreement).

The cardinal rule in construing an indemnity provision in a separation agreement is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. See *Bartlett v. Davis Corporation*, 219 Kan. 148, Syl. ¶ 2, 547 P.2d 800 (1976); *In re Marriage of Wessling*, 12 Kan. App. 2d at 430. "The intent of the parties to a separation agreement must be determined from the agreement alone if the terms are unambiguous. [Citation omitted.]" 12 Kan. App. 2d at 430. If the terms of the contract are clear and unambiguous, meaning that the contract is not understood to reach two or more possible interpretations, the court will enforce the contract in accordance with its terms. *In re Marriage of Gurganus*, 34 Kan. App. 2d at 717.

Indemnity is defined as

" 'an obligation resting on a party to make good any loss another has incurred while acting at his request or for his benefit; it is a right which inures to a person who has fulfilled an obligation owed by him but which as between himself and

another person should have been discharged by the other.' [Citations omitted.]" *Chetopa State Bancshares, Inc.*, 6 Kan. App. 2d at 332.

In this case, the parties' intent is located in the recitals section of the separation agreement. From their agreed-to statement, the parties assert that they "intend to settle all rights or claims between them *arising out of their marriage relationship, including* but not limited to *property division . . . .*" (Emphasis added.) The amount of the deficiency to Shirley after Hudson sold the marital residence and Loscher's conduct in procuring the initial loan from Shirley both arose out of the marriage relationship. Furthermore, according to the terms of the property division section, the parties expressly stated that their intent is for Hudson to be fully liable for the deficiency itself: "Husband shall completely satisfy any such deficiency and hold wife harmless therefrom." Therefore, since Loscher's criminal restitution embodies the amount of that deficiency, under the indemnity provision Hudson is required to reimburse Loscher for her direct financial loss concerning the deficiency. See 41 Am. Jur. 2d, Indemnity § 1, p. 415 ("It should be noted that the term 'indemnity' encompasses any duty to pay for another's loss or damage and is not limited to reimbursement of a third-party claim.").

Unless an indemnity agreement encourages the commission of the illegal act, a contract to indemnify *against the consequences of an illegal act that has already been committed* has generally been upheld. 8 Williston on Contracts § 19:18 (4th ed. 1998); see also 41 Am. Jur. 2d, Indemnity § 12, p. 426 (stating that an agreement to indemnify with respect to a crime which occurred prior to the making of the agreement is valid).

Here, Loscher's criminal acts took place during the summer of 1999. On November, 21, 2000, Loscher and Hudson entered into the separation agreement. On the same day, the separation agreement was incorporated into the divorce decree. Therefore, Hudson's agreement to indemnify Loscher occurred after Loscher's criminal acts and did not encourage Loscher's commission of wire fraud. Therefore, the indemnity provision should be upheld.

This case is distinguishable from *Bertagnolli v. Assn. of Trial Lawyers Assur.*, 934 P.2d 916 (Colo. App. 1997), and *Herrman v.*

*Folkerts*, 202 Kan. 116, 446 P.2d 834 (1968). In those cases, the indemnitees signed their indemnity agreements before their criminal acts had occurred and the indemnity agreements expressly excluded coverage. See *Bertagnolli*, 934 P.2d at 917-20 (insured notified insurer of the civil claims that had been filed against him, but the insurer denied coverage because the policy expressly stated that the insurer had no obligation to defend the plaintiff and the policy expressly excluded coverage for the insured claims; court upheld the denial of coverage); *Herrman*, 202 Kan. 116, Syl. ¶ 1, ("An insured under a personal liability policy which excluded 'damage to any property owned by, rented to, occupied or used by, or in the care, custody, or control of,' the insured, who went upon the land of another, took a tractor and started driving it down the road toward his own residence, intending to use it for his own purpose, all without the knowledge or permission of the owner, had the tractor in his 'care, custody, or control' and was not entitled to indemnity for loss sustained when the tractor was damaged on the highway.").

However, Hudson's argument on this issue also involves whether the indemnity provision becomes unenforceable on public policy grounds. In Kansas, our courts have held that contracts in contravention of public policy are void and unenforceable. See *Petty v. City of El Dorado*, 270 Kan. 847, 854, 19 P.3d 167 (2001). In addition:

"A court may be moved by two considerations in refusing to enforce an agreement on grounds of public policy. First, it may see its refusal as an appropriate sanction to discourage undesirable conduct, either by the parties or by others. Second it may regard enforcement of the promise as an inappropriate use of the judicial process to uphold an unsavory agreement. Both of these considerations turn on reluctance to aid the promisee rather than on solicitude for the promisor." 2 Farnsworth on Contracts § 5.1, pp. 2-3 (3d ed. 2004).

Consequently, because the enforcement of the indemnity provision might result in Loscher circumventing the conditions of her probation, this court must further determine whether the indemnity provision becomes unenforceable for public policy reasons.

To assist the appellate court with this determination, Restatement (Second) of Contracts § 178 (1979) provides guidance:

"(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

"(2) In weighing the interest in the enforcement of a term, account is taken of
    (a) the parties' justified expectations,
    (b) any forfeiture that would result if enforcement were denied, and
    (c) any special public interest in the enforcement of the particular term.

"(3) In weighing a public policy against enforcement of a term, account is taken of
    (a) the strength of that policy as manifested by legislation or judicial decisions,
    (b) the likelihood that a refusal to enforce the term will further that policy,
    (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
    (d) the directness of the connection between that misconduct and the term."

Loscher argues she relied upon the indemnity provision when she allowed Hudson to secure total control over the sale of the marital residence. The marital residence had a market value of $369,000, which was expected to cover both the $203,000 first mortgage and the $150,000 second mortgage. But, after the sale of the home, $66,000.84 of the second mortgage remained unpaid. Therefore, if enforcement of the indemnity provision were denied, Loscher contends that she would be penalized for Hudson's failure to sell the home at the home's anticipated value.

As a secondary reason, Loscher also states that she relied upon the indemnity provision when deciding to plead guilty to wire fraud. However, the plea hearing transcript indicates that Loscher accepted full responsibility for her crime and that she was entering her plea because she was guilty of the crime "and for no other reason."

"THE COURT: All right. Are you accepting responsibility for this [crime]? You seem very reluctant t—

"[Loscher]: Yes, Your Honor, I'm accepting responsibility."

In 1996, Congress enacted the MVRA, see 18 U.S.C. § 3663A (2000), which made changes to the Victim and Witness Protection Act, see 18 U.S.C. § 3663 (2000 ed. & Supp. V 2005). The changes

reflected a fundamental shift in the purpose of restitution from a means of punishment and rehabilitation to an attempt to provide those who suffer the consequences of crime with some means of recouping their personal and financial losses. See 26 A.L.R. Fed. 2d 283. For that reason, the MVRA mandated restitution for certain crimes, including Loscher's wire fraud conviction. See 18 U.S.C. § 3663A(c)(1)(A)(ii) (2000); 18 U.S.C. § 3663A (c)(1)(B).

The use of restitution for sentencing a defendant, however, resulted in disagreements among the federal circuits over the exact purpose of a restitution order. See Note, *Serving Two Masters: Evaluating the Criminal or Civil Nature of the VWPA and MVRA through the Lens of the Ex Post Facto Clause, the Abatement Doctrine, and the Sixth Amendment*, 73 Fordham L. Rev. 2711, 2712 (2005). The debate mainly arose in three contexts: (1) the application of the Ex Post Facto Clause to restitution orders; (2) the extension of the abatement doctrine to cover restitution orders, and (3) challenges under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), regarding whether the imposition of a restitution order must be presented to a jury at trial. See generally 73 Fordham L. Rev. at 2737-60 (discussing restitution under MVRA in these three situations); see, *e.g.*, *United States v. Serawop*, 505 F.3d 1112, 1122-23 (10th Cir. 2007) (acknowledging that disagreement exists among circuits over whether restitution is punitive).

In this case's context, however, it is not warranted for us to delve into the above controversy for the fact that our goal is simply to glean the public policy behind the MVRA. On this matter, the Senate Report accompanying the bill regarding the MVRA clearly sets out the public policy behind the mandatory restitution.

"The purpose of H.R. 665 is to improve the administration of justice in Federal criminal cases by requiring Federal criminal defendants to pay full restitution to the identifiable victims of their crimes. . . .

"This legislation is needed to ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due. It is also necessary to ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society. . . .

. . . .

"It is essential that the criminal justice system recognize the impact that crime has on the victim, and, to the extent possible, ensure that offender be held accountable to repay these costs. This is the essence of the committee's intent in favorably reporting the bill H.R. 665, the Victims Justice Act of 1995." S. Rep. No. 104-179, at 104th Cong., 2d Sess., 12, 18 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 925, 931.'

See *Serawop*, 505 F.3d at 1117-18.

In accordance with this dual purpose, it is apparent that the enforcement of the indemnity provision might be contrary to the public policy behind MVRA. Although Shirley would be compensated for Loscher's crime of wire fraud if this court enforced the indemnity provision, Loscher might not be held accountable for repaying those costs. Therefore, the latter purpose of the MVRA would not be met. Further analysis is required.

It is important to note that neither party examines Kansas law on this point, even though "[t]he public policy of a state is the law of that state as found in its constitution, its statutory enactments, and its judicial decisions." See *Petty*, 270 Kan. at 854.

In *State v. Applegate*, 266 Kan. 1072, 976 P.2d 936 (1999), the defendant pled guilty to three criminal acts. The district court sentenced the defendant to 36 months in prison but placed him on probation after the defendant served 30 days in the county jail. The journal entry of judgment further provided that criminal restitution, as mandated under K.S.A. 21-4610(d)(1), would be ordered at a later date. During this interim, a settlement of civil tort claims against the defendant was reached. In their civil settlement, the defendant's insurance carriers agreed to pay the victims a specified sum on behalf of the defendant. Therefore, at the criminal restitution hearing, the sentencing court determined that the civil settlement had satisfied the defendant's restitution obligation and declined to impose restitution against the defendant. From that ruling, the State appealed.

It is important to note that the *Applegate* court compared K.S.A. 21-4610(d)(1) to the MVRA. But, besides finding that the MVRA provided a specific statement for determining the amount and payment of restitution, unlike the general statement of the legislature's

intent found in K.S.A. 21-4610(d)(1), the court did not further address the components of the MVRA. See 266 Kan. at 1077-79.

In *Applegate*, the Kansas Supreme Court asserted that restitution served a dual purpose:

"Restitution is not merely victim compensation but also serves the functions of deterrence and rehabilitation of the guilty. Restitution imposed as a condition of probation is not a legal obligation equivalent to a civil judgment, but rather an option which may be voluntarily exercised by the defendant to avoid serving an active sentence." 266 Kan. 1072, Syl. ¶ 2.

However, if the victims have already received full compensation for their loss, the court contemplated that the purpose of restitution may be satisfied to avoid a windfall. 266 Kan. at 1076-77 (quoting *State v. Iniguez*, 169 Ariz. 533, 537, 821 P.2d 194 [1991], which stated that "because a primary purpose of restitution is to make the victim whole, and the other aim of restitution is rehabilitative rather than punitive, payment beyond that necessary to compensate does not serve the Legislature's purposes"). As a result, because K.S.A. 21-4610(d)(1) provided a general statement of legislative intent requiring the sentencing court to exercise discretion in ordering the amount of restitution for the actual damage or loss caused by the defendant's crime, the court held that the sentencing court did not abuse its discretion in finding that the civil settlement had already satisfied the statutory requirement for criminal restitution. 266 Kan. at 1080.

In examining the effect a civil settlement had on criminal restitution in *Applegate*, it appears that a defendant need not be personally liable for compensating the victim for his or her loss. In *Applegate*, the defendant's insurance carriers paid the victims on behalf of the defendant. If the indemnity provision is enforced in this case, Hudson would be paying Shirley on behalf of Loscher by reimbursing her for her restitution payments. Accordingly, the possibility exists that the enforcement of the indemnity provision would not violate Kansas' public policy so long as the victim was made whole for his or her loss.

"In doubtful cases, . . . a decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of

such terms. . . . Enforcement will be denied only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term." Restatement (Second) of Contracts, § 178, comment b (1979).

Here, it is unclear how this court should rule. On one hand, the enforcement of the indemnity agreement prevents Loscher from being held fully accountable for the consequences of her criminal actions, violating one of the purposes of criminal restitution under the MVRA. Thus, it would appear that public policy would be against the enforcement of the indemnity provision, especially in light of Loscher's voluntary plea of guilty and assertion that she was accepting responsibility for her crime, which included the mandatory criminal restitution.

On the other hand, by the time Hudson signed the separation agreement, it had to be clear to Hudson that Shirley had suffered a financial loss from Loscher's prior actions. Therefore, the court's enforcement of the indemnity provision ensures that the parties' expectations in making that agreement are protected while still satisfying the primary purpose of criminal restitution that Shirley, the victim, is made whole from her loss.

It is important to note that at the contempt hearing, Loscher acknowledged that the results from the contempt charge would affect her criminal case. Loscher stated that "I will probably have to go back to Colorado in the criminal case again after I get the divorce issue taken care of because it was based on the divorce agreement." Under 18 U.S.C. § 3664(k) (2000), this declaration is true although the statutory language is unclear whether the district court can further impose a fine against Loscher after its initial sentence. See 18 U.S.C. § 3663A(d) (2000) (stating that a restitution order "shall be issued and enforced in accordance with section 3664"). 18 U.S.C. § 3664(k) provides:

"A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim,

adjust the payment schedule, or require immediate payments in full, as the interests of justice require."

In Hudson's final argument, he asserts that the enforcement of the indemnity provision effectually delegates Loscher's duty under the plea agreement to Hudson, and the federal government, as obligee, has not consented to such a delegation. To support his assertion, Hudson requests this court to interpret Loscher's plea agreement, claiming that "[t]he plea agreement contains no language suggesting that the performance of this duty by another person would be acceptable to the Government, nor that such transfer of performance would be permissible."

Before we can interpret the criminal plea agreement, we must have jurisdiction over the matter. Neither party raises this issue on appeal; however, an appellate court has a duty to question jurisdiction on its own initiative. See *State v. Harp*, 283 Kan. 740, 746, 156 P.3d 1268 (2007). Additionally, even though the district court considered this particular argument in Hudson's motion to alter or amend, an appellate court does not acquire jurisdiction over the subject matter on appeal if the district court lacks jurisdiction to enter an order. See *State v. McCoin*, 278 Kan. 465, 468, 101 P.3d 1204 (2004).

The right to an appeal is purely statutory, and if the record shows that the appellate court does not have jurisdiction, the appeal must be dismissed. *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1271, 136 P.3d 457 (2006).

Here, the record shows that the plea agreement was entered in Colorado, outside this state's authority. Furthermore, the record demonstrates that the plea agreement was made with the federal government and, thus, federal law governs. Therefore, absent any statutory provision providing this court's appellate review over this issue, we must refrain from considering this argument on appeal.

We find that the hold harmless agreement was entered into when the parties were aware of the possibility of a deficiency that would need to be resolved. Hudson agreed to cover it. We do not believe this agreement was abrogated by the subsequent plea agreement. It would appear to be the province of the federal courts

to determine the impact of the parties' previous agreement on the conditions of the plea agreement.

The state district court correctly found that any payment of Loscher on the deficiency must, under the hold harmless provision, be reimbursed by Hudson.

Affirmed.

MALONE, J., dissenting: I respectfully dissent. I conclude that the indemnity provision in the separation agreement between Brenda S. Loscher and William B. Hudson should be unenforceable on public policy grounds. In my view, the majority focuses too much on upholding the intent of the parties and on the fact that Hudson knew what he was doing when he agreed to the provision. Actually the record is unclear on the intent of the parties and how much Hudson knew about Loscher's fraudulent scheme when he signed the separation agreement. In any event, if the indemnity provision violates public policy, it should not be enforced regardless of the intent of the parties.

In my opinion, balancing the factors under Restatement (Second) of Contracts § 178 (1979) tips in favor of not enforcing the indemnity provision on public policy grounds. Ensuring that the offender is held accountable to pay the victim of a crime is one of the dual purposes of criminal restitution under the Mandatory Victims Restitution Act. 18 U.S.C. § 3663A (2000). Under Kansas law, restitution is not only intended to compensate the victim of a crime, *but it also serves the functions of deterrence and rehabilitation of the guilty. State v. Applegate*, 266 Kan. 1072, Syl. ¶ 2, 976 P.2d 936 (1999). Here, the end result of enforcing the indemnification provision is that Loscher will not be held financially accountable to pay the victim of her crime. By requiring Hudson to reimburse Loscher for what amounts to criminal restitution payments, the functions of deterrence and rehabilitation of the guilty will be ill-served.

*Applegate* is distinguishable from the present case. The ruling in *Applegate* was driven by the court's desire to avoid a windfall for the victim in the form of double restitution payments. We are not faced with that consideration here.

Finally, Loscher negotiated a favorable plea bargain and received leniency from the federal court based on her acceptance of responsibility for her crime and on the fact that she was ordered to pay a large amount of restitution to the victim. The spirit and intent of the plea agreement and the federal sentence will be undermined if Hudson is obligated to indemnify Loscher for the payment of the second mortgage deficiency.